

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00448-CR

ANGELA DODD HAMAL                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

### FROM THE 271ST DISTRICT COURT OF WISE COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Angela Dodd Hamal appeals her conviction for possession of a controlled substance in an amount of four grams or more but less than 200 grams. In three points, Hamal argues that the trial court erred by denying her motion to suppress and her requested jury instructions. We will reverse and remand for a new trial.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Texas Department of Public Safety Trooper David Riggs stopped Hamal's vehicle after witnessing it travelling 79 miles per hour in a 65-miles-per-hour zone. When he approached Hamal's vehicle, Trooper Riggs noticed that Hamal was nervous, her hands were shaking, and she was looking down into a purse or bag. After asking Hamal to get out of the car, Trooper Riggs asked her several questions, including, "Have you ever been in any trouble for anything?" Hamal responded, "No." Hamal also responded, "No," when asked if she had anything illegal in her car. Trooper Riggs went back to his police car and requested that dispatch run her driver's license number. The criminal history check revealed that Hamal had been arrested nine times, four of which were for possession of controlled substances.

Believing that Hamal "may be hiding something," Trooper Riggs asked for consent to search her vehicle, which she denied. Trooper Riggs then called dispatch and requested a drug detection canine unit. While waiting for the canine unit to arrive, Trooper Riggs explained to Hamal that she had "seemed kind of nervous" when she got out of her car and had lied when she told him that she "had never been in trouble and never been arrested." Hamal replied, "No. No. I said that I am not in any trouble right now. I have been arrested. I do have a past, and it was a long time ago."

Corporal Robert Payne of the Wise County Sherriff's Office arrived with his drug dog approximately thirty-two minutes after the initial stop. Approximately

2

ten minutes later, the dog began sniffing Hamal's car and alerted on it. A search of her car revealed a pipe and a bag containing 4.82 grams of methamphetamine. Hamal was arrested.

Hamal filed a motion to suppress all evidence seized as a result of her arrest, and without holding a hearing, the trial court denied her motion. Neither party requested findings of fact or conclusions of law.

At trial, after both parties rested, the trial court denied Hamal's proposed jury instructions, including her request for a code of criminal procedure article 38.23 instruction. A jury convicted Hamal of possession of a controlled substance and, after she pleaded "true" to enhancement offenses, assessed punishment at thirty-five years' confinement. After a hearing, the trial court denied Hamal's motion for new trial, in which she argued that the trial court had erred by denying her motion to suppress. This appeal followed.

### III. EXPERT TESTIMONY REGARDING CANINE SNIFF

In a portion of Hamal's first point, she asserts that the trial court abused its discretion by overruling her rule 702 objection to the testimony of Corporal Payne as an expert witness regarding the canine sniff.[1]

---

[1]Hamal argues that the erroneous admission of Corporal Payne's testimony about the canine sniff was one reason why the trial court should have granted her motion to suppress. She did not urge this ground as part of her motion to suppress or in her motion for new trial based on the denial of her motion to suppress. Because we hold that the trial court did not abuse its discretion by overruling her rule 702 objection to this testimony, however, we need not address whether this was a proper basis for her motion to suppress.

## A. Standard of Review and Rule 702

We review a trial court's ruling on admissibility of scientific evidence under an abuse of discretion standard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). We review the trial court's ruling in light of the evidence that was before the court at the time of the ruling. *Id.* We must uphold the ruling if it was within the zone of reasonable disagreement. *Id.*

Rule of evidence 702, governing admission of expert testimony, provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. A proponent of scientific evidence must show by clear and convincing proof that the proffered evidence is sufficiently relevant and reliable to assist a factfinder in determining a fact issue or understanding the evidence. *See Weatherred*, 15 S.W.3d at 542; *State v. Smith*, 335 S.W.3d 706, 711 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

The court of criminal appeals has prescribed three criteria for assessing reliability of scientific evidence and has identified seven nonexclusive factors for consideration. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *see Winston v. State*, 78 S.W.3d 522, 525 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). However, because interpretation of a dog's reaction to a scent is based on training and experience rather than scientific principles, we apply the

4

"less rigorous" test set forth in *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). *See Winston*, 78 S.W.3d at 525–26 (applying *Nenno* standard to admissibility of dog-scent lineups); *see also Smith*, 335 S.W.3d at 711 (same). Under this standard, a court considers whether (1) the field of expertise is legitimate, (2) the subject matter of the expert's testimony is within the scope of the field, and (3) the expert's testimony properly relies on or utilizes the principles involved in the field. *Nenno*, 970 S.W.2d at 561; *Winston*, 78 S.W.3d at 526; *see also Smith*, 335 S.W.3d at 711.

### B. Corporal Payne's Testimony

Corporal Payne testified that after completing an eighty-hour training course, he and the dog were nationally certified in drug interdiction and that he was also nationally certified as a handler for the dog. To obtain certification, the dog had to prove its accuracy in locating concealed narcotics, including methamphetamine. Corporal Payne testified that the dog had not made any errors when it completed the national certification testing. He also testified that he had used the dog to detect drugs on many occasions and that the dog had successfully detected drugs or controlled substances inside vehicles. He said that the dog alerted through "a big head turn. You'll see his head, his shoulders, his whole body turn back, and follow the odor with his nose. And then he'll go into a sitting position."

5

Corporal Payne also testified about the events recorded by Trooper Riggs's dashboard camera and about the three separate alerts that the dog made on Hamal's car: (1) the alert on the passenger side door almost immediately after approaching the vehicle, (2) the alert after the dog jumped up and sniffed the interior of Hamal's car through the open passenger side window, and (3) the alert once the dog entered the vehicle. Corporal Payne stated that as he and Trooper Riggs searched Hamal's car, the dog continued to alert on the car. Corporal Payne said that after the dog alerted, he gave the dog its reward, a white rubber ball.

During cross-examination, Corporal Payne stated that he "wouldn't necessarily say [that he is] an expert witness," that he is not an expert at dog training, but that he is an expert at dog handling and could testify about what the dog did. He also testified that he had not trained the dog but that he knew what the dog's alert was, what training the dog had received, how responsive the dog was, and the dog's error rate. He said that he did not keep a numeric log of the dog's error rate and that determining the error rate is complicated because lingering scents could cause the dog to alert even after contraband has been removed.

## C. Admission of Testimony Not Abuse of Discretion

In four subpoints, Hamal attacks the trial court's implied finding that Corporal Payne's testimony satisfied the requirements of *Nenno's* third prong:

6

whether the expert's testimony properly relies upon or utilizes the principles involved in the field. *See* 970 S.W.2d at 561.

First, she alleges that Corporal Payne's "admission" that he was not necessarily an expert and was not present when the dog was trained required that the trial court sustain her objection. However, a review of the record reveals that although Corporal Payne admitted that he was not an expert in dog training, he detailed his credentials and experience and stated that he was nationally certified in dog handling and was an expert in that area. Corporal Payne's testimony supports the trial court's implied finding that he was qualified to testify as an expert witness in dog handling.

Second, Hamal asserts that Corporal Payne was disqualified as an expert witness because he was not present when the dog was trained, did not know the dog's error rate, and did not bring the dog's field records with him for Hamal's inspection. Corporal Payne testified about his credentials, expertise, and his experience with the dog that alerted on Hamal's car. Specifically, Corporal Payne stated that he and the dog had received national certification after completing an eighty-hour training course that included proving the dog's ability to detect illegal substances, including methamphetamine. Corporal Payne testified that the dog had detected drugs in vehicles on "many occasions." Thus, the trial court reasonably could have found that Corporal Payne was qualified to testify about the dog's actions on the night of Hamal's arrest.

Third, Hamal asserts that the trial court should have excluded Corporal Payne's testimony because he contradicted himself about how the dog alerts to the scent of narcotics and about the dog's reward. Hamal asserts that Corporal Payne told her on the night of her arrest that the dog alerted by sitting down and that this conflicted with his testimony at trial that the dog alerted by making a "'big head turn' (basically a full body turn) and then he sits." However, the trial court could have concluded that Corporal Payne's testimony simply elaborated on the dog's alert process as explained to Hamal on the night of her arrest. Hamal also points to a conflict between the video recording of the canine sniff, which she alleges shows Corporal Payne encouraging the dog with a black object, and Corporal Payne's testimony that the dog's reward is a "white, roundish rubber ball." Although the video does not clearly show the black object Hamal refers to, if in fact two distinct rewards existed, Hamal did not put on conflicting expert testimony that multiple rewards for drug dogs is improper. Consequently, the trial court could have determined that the use of multiple rewards was a proper principle in the field of canine-sniff testing.

Fourth, Hamal asserts that the video recording shows that Corporal Payne "cued" the dog. She asserts that Corporal Payne "led the dog directly to [her car], ordered the dog to stick his head in the window, and finally opened the door and ordered the dog into [her] car." At trial, Hamal did not offer expert testimony as to what constitutes "cueing," and on appeal, she does not explain how Corporal Payne's actions, as seen on the video, qualify as "cueing." Thus, the

8

trial court was within its discretion to find that Corporal Payne did not "cue" the dog and utilized the principles of the field of canine-sniff testing.

Additionally, the record does not support Hamal's sequence of events. The record shows that after a discussion with Hamal, Corporal Payne and his dog approached the passenger side of Hamal's car from the grassy area beyond the road's shoulder, walked to the front of the car, and walked along the passenger side toward the rear of the car, and that almost immediately the dog turned around and sat down—"alerted" per Corporal Payne's testimony—by Hamal's passenger door. Corporal Payne then instructed the dog to jump onto its hind legs and sniff the interior of Hamal's car through the open passenger window, after which the dog again sat down—noted as a second alert in Corporal Payne's testimony. After the dog sat down a second time, Corporal Payne opened Hamal's unlocked passenger side door and ordered the dog inside. Although not visible on the video recording, Corporal Payne testified that the dog alerted a third time while inside Hamal's car.

Having addressed all of Hamal's complaints regarding her rule 702 objection, we conclude that Corporal Payne's testimony did not fail the *Nenno* test and that the trial court did not abuse its discretion by admitting Corporal Payne's testimony over Hamal's rule 702 objection. *See* Tex. R. Evid. 702; *Nenno*, 970 S.W.2d at 561. We overrule this portion of Hamal's first point.

9

## IV. Motion to Suppress

In the remainder of her first point, Hamal argues that the trial court erred by denying her motion to suppress because Trooper Riggs lacked reasonable suspicion to continue detaining her for a canine sniff.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility

and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53. Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

When, as here, the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

### B. Law on Reasonable Suspicion

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. Once a defendant establishes that a search or seizure occurred without a warrant, the State bears the burden to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Amador*, 221 S.W.3d at

11

672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.*

During an investigative traffic stop, an officer is entitled to request information concerning the driver's license, ownership of the vehicle, the driver's insurance information, the driver's destination, and the purpose of the trip. *Lambeth v. State*, 221 S.W.3d 831, 836 (Tex. App.—Fort Worth 2007, pet. ref'd) (en banc) (op. on reh'g); *Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd); *see also United States v. Shabazz*, 993 F.2d 431, 436–37 (5th Cir. 1993); *Razo v. State*, 577 S.W.2d 709, 711 (Tex. Crim. App. [Panel Op.] 1979). An officer may also conduct a computer check on the driver's license and registration and for outstanding warrants as long as it does not

12

unreasonably prolong the time necessary to effect the purpose of the initial stop. *See Kothe v. State*, 152 S.W.3d 54, 63, 65 (Tex. Crim. App. 2004). Once an officer concludes the investigation of the conduct that initiated the stop, continued detention of a person is permitted only if there is reasonable suspicion to believe that another offense has been or is being committed. *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997).

Generally, a canine sweep does not constitute a search within the meaning of the Fourth Amendment. *See United States v. Place*, 462 U.S. 696, 707, 103 S. Ct. 2637, 2644–45 (1983); *Mohmed*, 977 S.W.2d at 628; *see also Crockett v. State*, 803 S.W.2d 308, 310 n.5 (Tex. Crim. App. 1991). The temporary detention of an automobile to allow an olfactory inspection by a police dog trained to detect the odor of illegal drugs is not offensive to the Fourth Amendment when based on a reasonable suspicion that the automobile contains narcotics. *Mohmed*, 977 S.W.2d at 628; *see also Crockett*, 803 S.W.2d at 311.

## C. Videotape of Stop and Trooper Riggs's Testimony

During Hamal's trial, the jury watched a video and audio recording of the stop taken by Trooper Riggs's dashboard camera. The recording shows that Hamal and Trooper Riggs brought their vehicles to a stop on the shoulder of the

highway.[2]  Trooper Riggs approached Hamal's car and initiated the following conversation with Hamal through her open passenger window:

Trooper Riggs: I was stopping you for speed.

Hamal: I know.

Trooper Riggs: Do you have your driver's license?

Hamal: I have my driver's license and my insurance, and I am really sorry.

Trooper Riggs: Okay, where are you headed to?

Hamal: Fort Worth.

Trooper Riggs: From where?

Hamal: Decatur.

Trooper Riggs: Coming from here.  Can you step back here with me?

Hamal: Yes.

Trooper Riggs: Back here out of the road.  I will talk to you.

Hamal: Okay.  Okay.[3]

Trooper Riggs: Is that your right address?

Hamal: Yes, sir.  I'm going home to Arlington.  Fort Worth, Arlington.

---

[2]The recording shows that both cars pulled off the highway at the 2:35 time stamp.  For clarity, we treat this time as 0:00 and outline all events thereafter as occurring at an elapsed time from this point.

[3]After exiting her car, Hamal joined Trooper Riggs on the shoulder of the highway.

Trooper Riggs:      But you were coming from Decatur.

Hamal:      Yes, sir.

Trooper Riggs:      What do you do here?

Hamal:      I was up here visiting a friend.

Trooper Riggs:      Okay, you're not working or anything?

Hamal:      No.

Trooper Riggs:      What year model is your car?

Hamal:      97.

Trooper Riggs:      Okay.

Hamal:      It goes too fast.

Trooper Riggs:      Yeah. It does.[4]

The following exchange occurred at an elapsed time of 1:86:

Trooper Riggs:      Have you ever been in any trouble for anything?

Hamal:      No.

Trooper Riggs:      Nothing illegal in the car or nothing?

Hamal:      No. No. No.

Trooper Riggs:      What's going to happen is there is going to be a citation for your speed.

Hamal:      Let me make it please . . . how fast was I going?

---

[4]At that point, Trooper Riggs walked away from Hamal and looked at the windshield of her car. Hamal and Trooper Riggs briefly discussed the location of Hamal's vehicle registration sticker. Trooper Riggs shone his flashlight into the interior of Hamal's vehicle as he walked back toward Hamal.

Trooper Riggs:    79.

Hamal:            79, oh gosh.  Oh my gosh, I am so sorry.

Trooper Riggs:    Alright, just wait here.  I will be right with you.

Hamal:            Okay.  Can I wait in my car?

Trooper Riggs:    No, just wait right here just a second.

Hamal:            Okay.

Trooper Riggs then returned to his squad car and called dispatch to check Hamal's driver's license for outstanding warrants and her criminal history.  At an elapsed time of 3:92, he learned that Hamal had nine prior arrests for possession of controlled substances, prostitution, and probation revocation and that Hamal's most recent arrest was seven months prior, in February 2008, for possession of a controlled substance.  Trooper Riggs said to himself in his squad car, "She said she's never been arrested.  Real nervous."  Trooper Riggs returned to Hamal, where the following exchange took place:

Trooper Riggs:    Just step back with me.  My ticket printer is running kind of slow.  Come back here and talk to me.

Hamal:            Yes, sir.

Trooper Riggs:    There's another part of my job out here; we look for illegal weapons, drugs, marihuana.  Do you have any of that in that vehicle?

Hamal:            I don't have any of that.

Trooper Riggs:    Would you care if I take a look for those items and search it?

16

| | |
|---|---|
| Hamal: | Yes, I do, sir. |
| Trooper Riggs: | You do. Okay, hang on just a second. I really am having trouble with my ticket printer here so this is going to take just a minute. |

Trooper Riggs returned to his squad car and called dispatch to request a canine unit, stating, "I have one refusing to consent." Corporal Payne responded that he would be there in about twenty minutes with a canine unit. Trooper Riggs again said to himself, "Says she had never been arrested." Trooper Riggs returned to Hamal, and the following exchange took place at an elapsed time of 11:09:

| | |
|---|---|
| Hamal: | I am sorry I was speeding. |
| Trooper Riggs: | Well alright here is the deal. I'll kill your car while we wait for the canine to come real quick and then I'll let you get on your way. Just wait right here for me. Stay right there. |
| Hamal: | What is the problem? Did I do something? |
| Trooper Riggs: | Well, yeah, you seemed kind of nervous when you got out and then you lied to me. |
| Hamal: | What did I lie to you about, sir? |
| Trooper Riggs: | You told me that you had never been in trouble and never been arrested. |
| Hamal: | No. No. I said that I am not in any trouble right now. I have been arrested. I do have a past, and it was a long time ago. I don't . . . |
| Trooper Riggs: | Well, if you had told me that, it would have been a little bit different, but . . . |

17

Hamal:            Well, I didn't know specifically what you were asking—if I had been in any trouble recently, or twenty years ago, or five years ago. . . . Plus, everybody's nervous who gets pulled over by law enforcement, who isn't?

Trooper Riggs:   Well, as soon as that dog gets here, then I'll let you get on your way. We'll run the dog around it and if everything is good, you'll be good to go.

While waiting for the canine unit to arrive, Hamal again asserted that she had misinterpreted Trooper Riggs's question; Trooper Riggs responded that he had interpreted her answer as her not being honest with him.

Corporal Payne arrived approximately thirty-two minutes after Hamal's initial stop and about twenty-three minutes after he was dispatched. Hamal immediately told Corporal Payne that she had misunderstood Trooper Riggs's question as asking if she was in any trouble and explained that, other than an arrest in February 2008 that "was thrown out by the grand jury," she had not been arrested in twenty years. There was about a nine-minute delay between Corporal Payne's arrival and the beginning of the dog's search due to the discussion between Hamal and Corporal Payne and a pat-down search of Hamal. The canine began sniffing Hamal's car at an elapsed time of 40:98, and it alerted on the car within seconds. After searching Hamal's car for fifteen minutes, the officers found a pipe and 4.82 grams of methamphetamine in a false-bottom spray can and arrested Hamal.

At trial, Trooper Riggs testified that when he stopped Hamal, he noticed that her hands were shaking and that she was looking down into a purse or bag

18

as he approached. He explained that after Hamal got out of her car, he did not notice her shaking anymore; when asked if she was still nervous while standing and talking to him, he responded that she "just [stood] real still." Trooper Riggs testified that he had detained Hamal because she was nervous and lied to him about her criminal history and that, at the time, he believed that she was possibly also lying about having something illegal in her car. On cross-examination, he stated that he did not initially have probable cause to search Hamal's vehicle but that he thought he had a right to call in a canine unit. He said that he knew nervousness alone was not an indicator of criminal activity; that he did not clarify his question about Hamal's past even though she told him that she had trouble hearing him and did not understand his question; and that he knew that the presence of a criminal record was not a factor that supported probable cause to conduct a search.

### D. Denial of Motion to Suppress for Lack of Reasonable Suspicion was Not Error

Hamal does not challenge the lawfulness of Trooper Riggs's initial detention of her for speeding. She contends, however, that he lacked reasonable suspicion to continue detaining her for a canine sniff once he concluded the investigation into speeding. The only facts that can support reasonable suspicion for Hamal's continued detention are Trooper Riggs's observation that she was nervous when he initially approached her vehicle; Trooper Riggs's discovery of Hamal's criminal history after she answered, "No,"

19

when asked if she had "ever been in any trouble for anything"; and Hamal's criminal history, which included multiple arrests for possession of controlled substances.

Hamal's nervousness is a factor to consider in determining reasonable suspicion, *see Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000); *Haas v. State*, 172 S.W.3d 42, 54 (Tex. App.—Waco 2005, pet. ref'd), but her nervousness alone does not support a reasonable suspicion determination, *see Davis*, 947 S.W.2d at 248; *Sieffert v. State*, 290 S.W.3d 478, 485 (Tex. App.— Amarillo 2009, no pet.). Likewise, Hamal's prior arrests cannot be the basis for reasonable suspicion, *see United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000) (noting that prior arrest alone does not amount to reasonable suspicion), but, in certain cases, they can be a factor to consider in determining reasonable suspicion when combined with other factors and especially when those arrests are drug related.[5] *See Parker v. State*, 297 S.W.3d 803, 811 (Tex. App.— Eastland 2009, pet. ref'd) (considering lengthy criminal history, including numerous drug offenses, as part of totality of circumstances in reasonable

---

[5]Although Trooper Riggs testified that he did not consider Hamal's criminal record, reasonable suspicion is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *See Ford*, 158 S.W.3d at 492; *Fernandez v. State*, 306 S.W.3d 354, 357 (Tex. App.—Fort Worth 2010, no pet.); *State v. Patterson*, 291 S.W.3d 121, 123 (Tex. App.—Amarillo 2009, no pet.) ("[T]he subjective reasons uttered by the officer to legitimize the stop have no bearing on the outcome if the totality of the circumstances nonetheless would lead a police officer to reasonably suspect that crime is afoot.") (citing *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)).

suspicion determination); *Coleman v. State*, 188 S.W.3d 708, 718–19 (Tex. App.—Tyler 2005, pet. ref'd) (same), *cert. denied*, 549 U.S. 999 (2006); *Powell v. State*, 5 S.W.3d 369, 378 (Tex. App.—Texarkana 1999, pet. ref'd) (same), *cert. denied*, 529 U.S. 1116 (2000); *see also Morris v. State*, No. 07-06-00141-CR, 2006 WL 3193724, at *3 (Tex. App.—Amarillo Nov. 6, 2006, no pet.) (mem. op., not designated for publication) (same). And regarding Hamal's denial of having "ever been in any trouble for anything," if Trooper Riggs could have reasonably interpreted her answer as a denial of having ever been arrested, the fact that Trooper Riggs discovered that she, in fact, had multiple prior arrests, including four drug-related arrests, is also a factor to consider in determining reasonable suspicion. *See, e.g.*, *United States v. Copeland*, 102 Fed. Appx. 855, 857–58 (5th Cir. 2004) (considering fact that officer discovered that passenger had lied when asked if he had ever been arrested as support for reasonable suspicion determination); *Coleman*, 188 S.W.3d at 718–19 (same); *Simpson v. State*, 29 S.W.3d 324, 328–29 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (same); *Powell*, 5 S.W.3d at 378 (same); *cf. McQuarters v. State*, 58 S.W.3d 250, 260 (Tex. App.—Fort Worth 2001, pet. ref'd) (concluding that officer lacked reasonable suspicion to detain defendant in order to conduct a canine search after lawful traffic stop and distinguishing *Powell* because, at the time of the *McQuarters* detention, the officer had dismissed his suspicions related to the initial traffic stop's purposes, had issued two warnings, and "did not catch appellant lying or discover any prior drug offenses").

21

Hamal argues that Trooper Riggs's questions regarding her past trouble and whether her car contained anything illegal were "not question[s] contemplated by the relevant case law," but a police officer's questioning, even on a subject unrelated to the stop, cannot be the basis for a Fourth Amendment violation. *See Shabazz*, 993 F.2d at 436 ("Mere questioning, however, is neither a search nor a seizure."); *see also Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991) (noting same); *St. George v. State*, 197 S.W.3d 806, 819 (Tex. App.—Fort Worth 2006) ("'[D]etention, not questioning, is the evil at which *Terry*'s second prong is aimed.'" (quoting *Shabazz*, 993 F.2d at 436)), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2007). The questioning at issue here did not extend the duration of the initial, valid stop; the questions were asked less than two minutes after Trooper Riggs stopped Hamal, during the course of his investigation of the original purpose of the stop, and prior to informing her that he was giving her a citation for speeding. *See Shabazz*, 993 F.2d at 436–37 (dismissing notion that a police officer's comments on an unrelated subject constitute a per se Fourth Amendment violation and holding as lawful an officer's questioning that did not extend the duration of the initial valid seizure); *see also Edmond v. State*, 116 S.W.3d 110, 114 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (concluding that questioning about drugs during a traffic stop was permissible when it did not unreasonably prolong the detention).

The crux of Hamal's suppression issue hinges on whether Trooper Riggs could have reasonably believed that Hamal was lying about having ever been

22

arrested when she denied having "ever been in any trouble for anything," even after she explained that she had misunderstood his question. If Trooper Riggs did not act reasonably in so believing, her nervousness at the beginning of the stop and her past criminal history, without more, could not provide the basis for her continued detention. *See Davis*, 947 S.W.2d at 248; *Parker*, 297 S.W.3d at 811; *Sieffert*, 290 S.W.3d at 485. If, on the other hand, Trooper Riggs was reasonable in believing that Hamal had understood his question and had lied, then case law supports the trial court's implied finding of reasonable suspicion for her continued detention based on her nervousness, her lying about her criminal history, and her lengthy criminal history, which included a very recent drug-possession arrest and three other drug-possession arrests.[6] *See Copeland*, 102 Fed. Appx. at 857–58 ("Copeland had lied to the officer about his prior convictions, and thus, the officer was justified in investigating further."); *Morris*, 2006 WL 3193724, at *3 (nervousness, history of multiple drug-related offenses, and lying about prior arrests supported reasonable suspicion determination); *Coleman*, 188 S.W.3d at 718–19 (reasonable suspicion existed based on suspect's prior drug-related arrests, lying about prior arrests, and possession of

---

[6]Hamal argues that the reason for the initial detention had concluded when Trooper Riggs told her that his ticket machine was "running kind of slow"; she asserts that her continued detention after that point was not warranted because it was not based on reasonable suspicion. But because Trooper Riggs learned of Hamal's criminal history prior to this point, and because we hold that the trial court did not err by finding that the trooper possessed reasonable suspicion to continue the detention at that point, this reasonable suspicion provided the basis for her continued detention. *See Mohmed*, 977 S.W.2d at 628.

small jeweler's bags commonly used in drug trafficking); *Simpson*, 29 S.W.3d at 328–29 (reasonable suspicion existed based on suspect's immediate exit from his vehicle, nervousness, blurted responses to officer's questions, and lying about prior arrests); *Powell*, 5 S.W.3d at 378 (nervousness, conflicting information, prior drug offenses, and lying when asked about prior arrests constituted sufficient facts to support reasonable suspicion).

Certainly, Trooper Riggs could have asked a clearer question—i.e., "Have you ever been arrested before?" or "Do you have a criminal history?" And evidence exists, via the videotape, that Hamal did not understand his question as asked and thought he was asking if she was currently "in trouble." But for purposes of a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling and give almost total deference to the trial court's rulings on questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez*, 195 S.W.3d at 108–09; *Johnson*, 68 S.W.3d at 652–53; *see Garcia-Cantu*, 253 S.W.3d at 241. And the relevant inquiry is the reasonableness of Trooper Riggs's belief that Hamal was lying about her prior arrests. *See Madden v. State*, 242 S.W.3d 504, 508 n.7 (Tex. Crim. App. 2007) (noting factual issue was not whether defendant was actually speeding, but whether officer had reasonable belief that defendant was speeding). The trial court could have determined, based on the videotape of the stop and Trooper Riggs's testimony, that a reasonable officer would have

24

reasonably believed that Hamal clearly heard the trooper's question; on the videotape of the stop, Hamal did not seek clarification of the question, she answered almost it immediately, and nothing suggests that she had trouble hearing anything else the trooper said. The trial court could have also determined from the video and testimony that a reasonable officer would have reasonably believed that Hamal understood the trooper's question as asking if she had ever been arrested and that she denied it. As we will explain in more detail in addressing Hamal's second and third points below, the record does contain evidence to dispute the trooper's belief that she was lying, but under the applicable standard of review and affording almost total deference to the trial court's determination of historical facts, the evidence does not conclusively establish that a reasonable officer would have concluded that Hamal misunderstood or did not hear the question asked. *See Amador*, 221 S.W.3d at 673; *Montanez*, 195 S.W.3d at 108–09; *Johnson*, 68 S.W.3d at 652–53; *see also Garcia-Cantu*, 253 S.W.3d at 241.

Consequently, we hold that the trial court did not err by finding that Trooper Riggs had reasonable suspicion to continue detaining Hamal based on his observation of her nervousness when stopped, his belief that she had misrepresented that she had never been arrested when, in fact, she had nine prior arrests, including four drug-related arrests, and her lengthy criminal history,

25

including several (and one very recent) drug-related arrests.[7]  *See Morris*, 2006 WL 3193724, at \*3; *Coleman*, 188 S.W.3d at 718–19; *Simpson*, 29 S.W.3d at 329; *Powell*, 5 S.W.3d at 378–79.  Because the trial court did not err by denying Hamal's motion to suppress on this basis, we overrule the remainder of her first point.

## V. REQUESTED JURY INSTRUCTIONS

Hamal consolidates her second and third points, stating that the trial court erred by failing to include her fourth and sixth requested jury instructions and an article 38.23 instruction in the jury charge.  She asserts that she was entitled to these instructions because the evidence showed that Trooper Riggs thought she had lied about her criminal history but that she thought she had truthfully answered the question as she had heard it, thus creating a disputed issue of fact.

### A. Standard of Review

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v.*

---

[7]Hamal also argues that Trooper Riggs's "inarticulate hunch that [she] 'may be hiding something'" was insufficient to support reasonable suspicion that she was engaged in illegal activity.  However, unlike in the cases cited by Hamal, *see Davis*, 947 S.W.2d at 245; *Sieffert*, 290 S.W.3d at 487 (driving in high crime area and nervousness supported nothing more than hunch); *Wolf v. State*, 137 S.W.3d 797, 804 (Tex. App.—Waco 2004, no pet.) (nervousness and being overly cooperative did not support inference of illegal activity), when the evidence in this case is viewed in an objective fashion, Hamal's nervousness, her lying about her criminal history, and the revelation that she had four drug-related arrests, one of which occurred just seven months prior, supplied the articulable facts to support reasonable suspicion that she may be hiding drugs. *See Morris*, 2006 WL 3193724, at \*3; *Powell*, 5 S.W.3d at 378.

*State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we must determine whether error occurred, and if it did, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 732.

## B. Law on Article 38.23 Instructions

Article 38.23(a) of the code of criminal procedure prohibits the admission of evidence against an accused in a criminal trial if the evidence was obtained in violation of the Texas or United States constitutions or laws. Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005). The statute further provides,

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

*Id.*

If a defendant successfully raises a factual dispute over whether evidence was illegally obtained, inclusion of a properly worded article 38.23 instruction is mandatory. *Madden*, 242 S.W.3d at 510. To be entitled to the submission of a jury instruction under article 38.23(a), a defendant must establish that (1) the evidence heard by the jury raises an issue of fact; (2) the evidence on that fact is affirmatively contested; and (3) the contested factual issue is material to the lawfulness of the challenged conduct in obtaining the evidence. *Id.*; *cf. Oursbourn v. State*, 259 S.W.3d 159, 177 (Tex. Crim. App. 2008). If there is no dispute regarding the factual basis for the challenged search or seizure, then the

27

legality of the conduct is determined by the trial judge alone—as a question of law—and a jury instruction is inappropriate. *Madden*, 242 S.W.3d at 510. "A fact issue about whether evidence was legally obtained may be raised 'from any source, and the evidence may be strong, weak, contradicted, unimpeached, or unbelievable.'" *Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004) (quoting *Wilkerson v. State*, 933 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd)).

**C. Disputed Issue of Material Fact Warranted Article 38.23 Instruction**

In this case, whether a disputed issue of fact existed warranting an article 38.23 instruction centers around Trooper Riggs's question, "Have you ever been in any trouble for anything?" and whether he was reasonable in believing that Hamal correctly heard his question and understood it as asking whether she had ever been arrested. As we stated above, the trooper's question was not a model of clarity. Not only is it vaguely and broadly worded—using the term "in trouble" instead of "arrested" or "convicted"—but the videotape of the stop and Trooper Riggs's testimony establish that Hamal disputed that she understood what he was asking her. When Trooper Riggs informed Hamal that she had lied about having "never been in trouble and never been arrested," she immediately responded, "No. No. I said that I am not in any trouble right now. I have been arrested." She further explained, "Well, I didn't know specifically what you were asking—if I had been in any trouble recently, or twenty years ago, or five years ago." And she immediately told Corporal Payne upon his arrival that she had

28

misunderstood Trooper Riggs's question as asking if she was currently in trouble. On the other hand, the videotape shows Trooper Riggs telling her that he thought she was lying about having ever been arrested, and he also testified at trial that he thought she was lying: "The question was clearly asked, and I just felt like she was avoiding the question." Trooper Riggs further testified that Hamal had told him at the scene that she misunderstood his question.

In *Madden*, the court of criminal appeals discussed the circumstances in which an article 38.23 instruction is and is not required. *See* 242 S.W.3d at 511–14. The court held that a disputed issue of fact existed about whether the appellant was speeding—the officer's reason for stopping the appellant—because the videotape of the stop showed the appellant claiming that he had not been speeding. *Id.* at 508, 511. Regarding this disputed issue of fact, the court of criminal appeals approved of an instruction that informed the jurors that no evidence obtained in violation of the constitutions or laws of the United States or Texas shall be considered and continued by stating:

> You are further instructed that our law permits the stop and detention of a motorist by a peace officer without a warrant when the officer has reasonable suspicion to believe that a traffic offense has been committed.
>
> . . . .
>
> . . . [I]f you find from the evidence that, on the occasion in question, Officer Lily did have a reasonable suspicion to believe that [appellant] was driving at a speed greater than 55 miles per hour on a portion of the highway with a posted speed limit of 55 miles per hour immediately prior to the stop, then you may consider the evidence obtained by the officer as a result of the detention.

*Id.* at 508 n.7. The court of criminal appeals found this instruction "admirable" because it directed the "jury's attention to the one historical fact—Officer Lily's reasonable belief or 'suspicion' that appellant was going faster than 55 m.p.h.—in dispute and tells the jury to decide this fact." *Id.*

In this case, the factual issue for the jury is not whether Hamal misunderstood Trooper Riggs's question as asking whether she was currently in trouble; rather, the issue is whether Trooper Riggs was reasonable in believing—after Hamal answered his question and also after she informed him that she had misunderstood the question—that Hamal had heard and understood what he was asking and had lied about having ever been arrested. *See id.* ("Even police officers may be mistaken about an [sic] historical fact such as "speeding," as long as that mistake was not unreasonable."). We believe this is similar to the disputed issue of fact about whether the appellant was speeding in *Madden*. *See id.* at 511. The videotape of the stop, as well as Trooper Riggs's testimony, raised this issue of fact, and the evidence on that fact was affirmatively contested.[8] *See id.*

---

[8]The State argues that no evidence was presented at trial that Hamal misunderstood the question to raise a disputed issue of fact—"[t]here was a dispute as to [Hamal]'s interpretation of the question *only at the scene* and not in any evidence presented at trial." [Emphasis added.] But the videotape of the stop was admitted at trial and played for the jury. Both the videotape of the stop and Trooper Riggs's testimony raised the disputed issue of fact. *See id.* at 513 (explaining that cross-examiner's questions do not create conflicts in the evidence but witness's answers to those questions might, and relying on videotape of stop as creating an issue of fact).

30

Furthermore, the contested fact issue—whether Trooper Riggs reasonably believed that Hamal had lied to him about her prior arrests—was material to the lawfulness of the continued detention. *See id.* at 510–11. As we stated above in our suppression analysis, Hamal's nervousness at the beginning of the stop and her past criminal history, without more, could not provide the basis for her continued detention, and consequently, Trooper Riggs's reasonable belief that she was lying about her prior arrests was a necessary fact as part of the totality of the circumstances to support a reasonable suspicion determination. *See Jones*, 234 F.3d at 242; *Davis*, 947 S.W.2d at 248; *Parker*, 297 S.W.3d at 811; *Sieffert*, 290 S.W.3d at 485. Had the jury believed the contrary evidence—that Hamal had misunderstood Trooper Riggs's question and had not lied to him about her prior arrests—and believed that Trooper Riggs was not credible in his testimony—that he thought Hamal was lying, even after she explained to him that she had misunderstood his question—then the continued detention would not have been justified. *See Reynolds v. State*, 848 S.W.2d 148, 148–49 (Tex. Crim. App. 1993) ("[A]lthough a conclusion that the officer was mistaken would not affect the legitimacy of his stopping appellant, a conclusion that [the officer] was lying would.").

Consequently, because the evidence at trial showed a factual dispute as to whether Trooper Riggs's belief that Hamal had understood his question and was lying about having been arrested in the past was reasonable, and because this factual dispute was material to the determination of reasonable suspicion to

31

continue detaining Hamal for a canine sniff, we hold that she was entitled to a jury instruction on article 38.23 and that the trial court erred by denying her request for that instruction. *See* Tex. Code Crim. Proc. Ann. art. 38.23; *Madden*, 242 S.W.3d at 513.

## D. Harm

Having found error, we must now determine whether Hamal was harmed by the trial court's failure to include an article 38.23 instruction in the jury charge. Hamal objected to the charge and provided the trial court with several proposed charges, the fourth and sixth of which are relevant here. Her fourth proposed charge begins by restating the first paragraph of article 38.23(a), but the remainder of the proposed charge discusses probable cause and does not set out the factual issue for the jury to decide. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a); *Madden*, 242 S.W.3d at 508 n.7; *see also Holmes v. State*, 248 S.W.3d 194, 199–200 (Tex. Crim. App. 2008) (explaining that if contested fact issue exists, jury should be instructed about the conflict considering the specific historical fact that is material to the legality of obtaining the evidence). Hamal's sixth proposed charge instructs that the factual dispute is

> whether the accused intentionally made a false response to Officer Payne's[9] question, "Have you ever been in trouble[.]" . . .
>
> Now therefore, bearing in mind the foregoing instruction, if you find from the evidence beyond a reasonable doubt that the

---

[9]Hamal points out on appeal that the jury instruction incorrectly stated that Corporal Payne, rather than Trooper Riggs, asked the question.

accused's response to the question, "Have you ever been in trouble[,]" was an intentional attempt by the accused to mislead the officer as to her prior criminal record so as to raise a reasonable suspicion of contraband being in the accused's vehicle, then you may consider the evidence obtained by the search of accused's vehicle.

The proposed instruction did not include the legal background for the issue, and it did not correctly set out the factual issue for the jury to decide. *See* Tex. Code Crim. Proc. Ann. art. 38.23; *Riley v. State*, 830 S.W.2d 584, 586–87 (Tex. Crim. App. 1992) ("[Article] 36.14 requires the judge to provide the jury with both an abstract statement of the law and an application of that abstract statement to the evidence in the case."). Consequently, Hamal failed to present a proper requested instruction.

When a defendant fails to present a proper requested instruction, any error in the charge "should be reviewed only for 'egregious harm' under *Almanza*." *Madden*, 242 S.W.3d at 513; *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006); *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Egregious harm is the type and level of harm that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Allen*, 253 S.W.3d at 264 & n.15; *Olivas v. State*, 202 S.W.3d 137, 144, 149 (Tex. Crim. App. 2006); *Almanza,* 686 S.W.2d at 172.

In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Hutch*, 922 S.W.2d at 172–74. The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. Egregious harm is a difficult standard that must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *Hutch*, 922 S.W.2d at 171.

Here, regarding the jury instructions, because the jury was not provided an article 38.23 instruction, it was allowed to consider evidence obtained as a result of Hamal's continued detention without first determining a fact issue related to that detention. If properly instructed, the jury would have been required to disregard the evidence obtained from the continued detention if it believed that Trooper Riggs was not reasonable in believing that Hamal correctly heard his question and interpreted it as asking whether she had ever been arrested. *See Hutch*, 922 S.W.2d at 172–73; *Reynolds*, 848 S.W.2d at 149.

Regarding the state of the evidence, whether Hamal understood Trooper Riggs's question and lied about having been arrested was a contested issue at trial. And as we have stated, if Trooper Riggs was unreasonable in believing that Hamal had lied about her prior arrests, then he could not have had reasonable

34

suspicion to continue the detention. *See Davis,* 947 S.W.2d at 248; *Parker*, 297 S.W.3d at 811; *Sieffert*, 290 S.W.3d at 485.

Turning to the arguments of counsel, the State argued during opening arguments that Trooper Riggs's question was clear and simple, allowing him to determine that Hamal had lied to him; defense counsel argued in both opening and closing arguments that the question asked was ambiguous and open-ended and that Hamal did not understand it.

Given this record, we conclude that the trial court's failure to provide an article 38.23 instruction created such harm that Hamal did not have a fair and impartial trial. *See Almanza*, 686 S.W.2d at 171; *see also* Tex. Code Crim. Proc. Ann. art. 36.19; *Allen*, 253 S.W.3d at 264; *Hutch*, 922 S.W.2d at 171. We sustain Hamal's second and third points.

## VI. CONCLUSION

Having sustained Hamal's second and third points, we reverse the trial court's judgment and remand to the trial court for a new trial.

SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

MCCOY, J. concurs without opinion.

PUBLISH

DELIVERED: September 22, 2011